IN THE UNITED STATES DISTRICT COURT
FOR THE NORHTERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TERRY SMITH,<br>    Plaintiff<br><br>v.<br><br><br><br>ILLINOIS DEPARTMENT OF<br>TRANSPORTATION,<br>    Defendant | )<br>)<br>)<br>)<br>)    Case No. 1:15-cv-02061<br>)    Honorable Edmund E.<br>)    Chang<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OT ITS RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND TO BAR EXPERT TESTIMONY**

NOW COMES Plaintiff, TERRY L. SMITH (hereafter "Plaintiff"), by and through his attorney, John M. O'Toole, of O'Toole Law Firm, LLC, and submits this Memorandum of Law in support of it Response to deny ILLINOIS DEPARTMENT OF TRANSPORATION'S (hereafter Defendant's) Motion for Summary Judgment and Bar Expert Testimony.

I. **BACKGROUND**

Plaintiff started work with the Defendant on August 1, 2013 and was terminated on January 30, 2014. Plaintiff job was that of an Emergency Traffic Patrol (hereafter "ETP") minuteman. Plaintiff was allegedly discharged for failing to complete his probationary period (6 months) and failing to achieve work performance and safety standards. Plaintiff maintains that the failure to achieve work performance and safety standards is a pretext and that the real reason that Plaintiff was discharged was due to retaliation based on race and hostile work environment based on race as well.

Plaintiff's job required him to remove disabled vehicles and to keep roadways free of debris and other materials. Being an ETP minuteman also requires that the individual know how to operate the organization's radios and vehicles, understand the location of key entrance and exit highway ramps, the geographic surroundings in and around Chicagoland, and, work in

1

unison with Illinois State police and other IDOT employees in the event of a major traffic incident such as a semi-trailer truck rollover or multi-car vehicular crash.

Prior to becoming a permanent or full-time employee, Plaintiff as well as other new recruits were obliged to undergo a probationary period lasting six (6) months. The purpose of the probationary period is to introduce the new employee to the culture of the organization, undergo classroom instruction about traffic and safety topics and obtain hands-on experience with the vehicles and equipment. By its very nature, being a minuteman is a dangerous job and safety is of paramount importance.

Plaintiff (African American) was teamed up with Jaime Lopez (hereafter "Lopez") so as to undergo training together. One of the earlier methods of training employed by Defendant was "shadowing" whereby another IDOT vehicle rode close by to observe how the new employee controlled his vehicle, reacted to emergency situations, worked his or her radios and otherwise performed their job. Plaintiff's prospects started out well but then deteriorated under the supervision of Marcello Valle (hereafter "Valle.") Plaintiff was subject to repeated obscenities and other abusive language. Plaintiff complained about this conduct by Valle to John Gonzales, the Patrol Manager but nothing was done about it. Valle received no written reprimand or note in his file. At most, he got some" verbal counselling." I feel it important to call to the Court's attention that verbal counseling is the preferred medium of disciplinary proceedings on the part of the Defendant and doesn't even amount to a slap on the wrist. With all retaliatory and hostile conduct Plaintiff was forced to endure, interestingly, not one employee of Defendant received a written reprimand or suspension of any kind. Plaintiff never made it to his 6-month anniversary.

## II.　STANDARD OF REVIEW

### A.　Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When presented with a summary judgment motion, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). "In evaluating whether a genuine issue of material fact exists, all evidence and inferences must be viewed in the light most favorable to the nonmoving party." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003) (citing *Anderson v. Loberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003)). "[A] court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it ,must view all the

2

evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullah v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing Anderson, 477 U.S. at 255).

### B.  Rule 702: Evidentiary Reliability under Daubert and Kumho Tire Co.

Federal Rule of Evidence (hereafter "FRE") is titled **Testimony by Expert Witnesses**. The rule identifies who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and, (d) the expert has reliably applied the principles and methods to the facts of the case. District court judges have significant responsibility to determine if the expert testimony is relevant and helpful.

## III.  ARGUMENT

### A.  Plaintiff's Withdrawn and Abandoned Claims Should be Dismissed.

Plaintiff had abandoned his race discrimination claim, but, has not abandoned his factual averments that Lopez was given more favorable treatment for purposes of their retaliation claim. Ditto with respect to the application of certain policy/training procedures as applied to Plaintiff and not Lopez.

### B.  Plaintiff Cannot Sue Under Section 1981

Plaintiff agrees

### C.  The Court Should Enter Summary Judgment on Plaintiff's Failure to Promote Claim

Plaintiff agrees

### D.  Plaintiff was not Retaliated Against

Plaintiff can meet its burden to sustain a claim based on retaliation. Firstly, looking at the requirement of "statutorily protected activity." Plaintiff was reporting racially

3

discriminatory treatment. For instance, on January 14, 2014, Plaintiff sent a memorandum to Debbie Allen in which the Subject is "Discrimination form A-Shift/C-Shift." (Ex. 8 2014PLT00037). In this memorandum, Plaintiff cites how he was discriminated against by Mark Jercha and Jay Seifried who are both white. Plaintiff was of the belief that his poor evaluations were made to appear that he was struggling while Lopez (Hispanic) was treated differently – he (Lopez) was allowed to report to his assignments late. One can make the inference that Plaintiff was discriminated against because he is African American. Ditto with respect to favorable treatment offered to Jamie Lopez and not Plaintiff when it came to be reporting on time. While race is not specifically mentioned, it is implied seeing how Lopez is Hispanic, Plaintiff is African American, and the subject line mentions Discrimination. Also, Plaintiff was continuing to be "shadowed" while Lopez was not according to Gonzales. (Def. Ex. 8 110:7-9).

In addition to the above, MH (Marvin Harrison) in his Affidavit says in ¶ 4 that "It is my opinion that had management followed proper procedure, which they did with white employees, the ill-treatment being imposed on TS (Terry Smith) would not have happened. MH is referring to the racially discriminatory treatment because just above, in the same paragraph, he says under (a) "I witnessed TS being discriminated against on many occasions by the department and its agents."

There is no question that Plaintiff overcame the second prong of the requirement – that having to do with an adverse employment action. Here, Plaintiff was terminated.

The last requirement calling for a causal connection is supported by the treatment afforded Lopez. MH stood up for his rights and some felt that he was being "cocky." MH asked questions and was basically told to stop by Zen McHugh – "the only thing that he should say is yes sir, no sir" (Def. Ex. 2 189: 1-7). Lopez wasn't treated this way. (Id. 189: 11-12). Also, Maria Veronico's report shows the causal connection and retaliation which came out of it after Plaintiff filed his reports. On page 8 of her report, she opines that "If the situation was so serious and the plaintiff was being treated in a non-discriminatory fashion then disciplinary action should have been taken to attempt to notify plaintiff of how serious this was and to attempt to correct unacceptable progress and behavior." (Ex. 10, Section 2, pages 8-19)

    a.    **Plaintiff Cannot Assert Retaliation for Incidents that Pre-Date his Complaints.**

Agreed

    b.    **Plaintiff's Poor Work Performance Cuts Off any Causal Link.**

Denied. Plaintiff 's work performance was inconsistent. There are some laudatory reports about Plaintiff. (Ex. 4). Also, Veronico's expert report does establish the causal link – it is in Issue 1 of her report where she opines on page 4 that "I believe that defendant was

retaliated against after filing complaints. It appears from evaluations that he was doing O.K., he would then file a complaint and then his evaluations became unacceptable and comments became more and more negative. This is a pattern that I have seen throughout as illustrated below."

### 4. Plaintiff Cannot Deny the Legal Conclusion That the State Court Reached in Rendering his Conviction for Reckless Conduct.

This has to do with issue preclusion which was addressed by the Court and does not assume the merits of the claim. Furthermore, the Plaintiff's conviction arises out of an Illinois Appellate Court opinion over which no discovery would be taken.

### E. Plaintiff Cannot Establish A Hostile Work Environment Based Upon Race.

To prevail on his hostile work environment claim, Plaintiff has to prove the he was subject to unwelcome harassment based on his race, that is was sufficiently severe or pervasive to create a hostile or abuse work environment. See, e.g., *Williams v. Waste Mgmt.*, 361 F.3d 1021, 1029 (7th Cir. 2004). Referencing *Sutheland v. Wal-Mart Stores, Inc.* 632 F.3d 990 (7th Cir, 2011), the Defendant could be liable for the hostile work environment if it did "not promptly and adequately respond to employee harassment." That means, it needed to "respond in a manner reasonably likely to end it," (Id. At 995). Also, "the efficacy of an employer's remedial action is material to [a] determination whether the action was reasonably likely to prevent the harassment from recurring," *Cerros v. Steel Techs, Inc.* 398 F.3d 944, 954 (7th Cir, 2005).

Plaintiff complained of harassment and particularly a racial hostile work environment on several occasions. But firstly, it is worth noting what MH (Marvin Harrison) had to say about this. In his Affidavit, MH said that "TS (Terry Smith) was also mistreated by unqualified trainers and supervisors. He was mistreated by Lloyd Colbert who called him the *"N-word"* (emphasis supplied) frequently. Lloyd Colbert who upon his return from IDOT's EEO office in Schaumburg, IL. is reported to have said to Plaintiff that "… it's going to be 81 of us against 1 of you when we go to trial. He said that – he called me ***stupid ass nigga*** (emphasis supplied); that I was going to lose everything that I own, my house and my car. (Def Ex. 2 117:5-11). Roman McGhee called Plaintiff a "God damn liar" "He called me a stupid dumb Mother Fr." "I ain't never shit." (Id. 201;14-21). McGhee also told Plaintif that he "I'll kick your ass you dumb m-f-r" and so forth (Def Ex. 11 31:5-6). Employees with the Defendant had to step in and stop McGhee. As mentioned earlier, Plaintiff was harassed verbally by Valle – see Ex. 6. At his deposition, Plaintiff was asked "Even in the Marines, did you face the type of language and yelling and cursing as you experienced at IDOT and Plaintiff's response was "No." As a result of all of these acts of harassment, Plaintiff ended up seeing a psychiatrist for depression (Id. 216:7-24, a, 217:1-8.)

5

And what did Defendant do about these reports of racial harassment and hostile workplace – next to nothing! They did verbal counseling. There were no written reprimands, suspensions or firings. Defendant's response was to basically do nothing. Regarding the McGhee incident, Schivarlelli said he sent Plaintiff's memo to the Personal Department and according to Schivarelli, they never came back to him. (Def Ex. 11 33: 2-3). When asked if he followed up, he said "No, I really don't" (Id. 15-21). Regarding this same incident, Gonzales was asked if he notified Human Resources, and he said "No, I did no" (Def Ex. 8 84:19) Also, when asked if any mention had been made in their personnel files, he answered "Other than verbal – other than verbal – no." (Id. 84:22-24). As for Mr. Colbert, there was no disciplinary actions taken against him either – it was all verbal (Def Ex, 8 76:7-12).

### F.    IDOT had Legitimate, Non-Retaliatory Reasons for its Actions.

Defendant had no legitimate reasons to engage in retaliation or foster a hostile work environment based on race as mentioned above and discussed above.

### G.    The Court Should Bar Expert Testimony from Maria Veronico

### 1.    None of Veronico's Opinions are Based on Reliable Methods

Veronica is an expert witness so what Defendant is saying what an "employer" should do is irrelevant to her.   Also, Veronico never admitted that her methodology was inadequate – quite the opposite. She was asked the question at her deposition "Is there a particular methodology, common methodology brought to these  sorts of cases. I think that you need to be more specific: Veronico then walked counsel through her procedure (Def Ex. 54 37:9-25)

Veronico was not required to contact any of the individuals who authored the documents. Since this case is in litigation, she probably thought that it would be denied, and, furthermore, she had received from Plaintiff's counsel 2-feet of documentation. This is no different than a medical malpractice action -experts normally don't interview and take sworn statements on a putative plaintiff in order to arrive at a SCR 2-622 opinion. Also, Veronico did not just use documents supplied by counsel, she used documents that counsel obtained from the other side.

### 2.    Veronico's Opinions are not Based on Sufficient Facts or Data

Plaintiff disagrees that many individuals' facts are undisputed. The Defendant doesn't identify who these individuals are. Also, counsel's reliance on *Scott v. Chuhak & Tecson, P.C.*, No. 09 C 6858, 2011 WL 4462915 is misplaced – just because testimony may have been adduced does not make it undisputed.

6

Plaintiff also disagrees that Veronico only had to take sworn testimony to determine if someone had diversity training. This is like seeing footprints in the snow - you don't have to see the person to know that someone was walking there. Here, Veronico had daily training reports, memorandums, E-Mails, FAX's, personnel performance reviews, letters and other forms of correspondence about Plaintiff from just about anyone who came in contact with him. There comes to the point where one can have information overload – how much is enough. Veronico thought that she had sufficient information and documentation whether it's called facts or date – means the same thing. There are cost and time limitations which come into play as well. Also, for Seifried – he could not remember if the diversity training offered by a retired master sergeant even included guidance on how to deal with those who were slow-learners or combative, (Def Ex. 7: 8-10). And for Jercha, he could not remember if he had the training prior to 2013. He recalls having it in 2015. (Def. Ex. 13 18:4-13). As a result, for the operative timeframe of August 1, 2013 (Plaintiff's start date) until his termination date of January 30, 2014, it is quite possible that Defendant had *no* diversity training. The evidence does not show that Defendant had diversity training during the operative timeframe mentioned immediately above.

Veronico opines that she did not see evidence of **constructive** (emphasis supplied) help. This means that the training was not effective and not necessarily that it wasn't attempted. Veronico, as respects the effectiveness of counseling, also said its successful implementation would depend on the circumstances. (Def. Ex. 54 32:19-25). Seifried's corrective action plan consisted almost entirely of counseling. (Ex. 7: 15-18). McGhee is the only one who seemed to have a good corrective action, but this was overtaken by the blow-up he had with Plaintiff regarding the alleged back-up of a vehicle on an off-ramp and verbal obscenity-laden exchange with Plaintiff.

In addition to her expert report, Veronica had 33 attachments. (Def. Ex, 54 12:8-10). She also admits to reviewing all the documents received from counsel. There is no reason that she should have to doubt the word of someone in these business records. It's clear from the records according to Veronica that Ramirez, Colbert or McHugh retaliated against Plaintiff. The *Luckie* case cited by the Defendant only talks about **actual knowledge** (emphasis supplied) but doesn't say when that actual knowledge had to occur.

### 3. Veronica is not Qualified to Render Opinions Relating to Plaintiff's Performance.

The Defendant has got it wrong. Veronica was not brought onboard to access the performance of Plaintiff, but rather, the performance of supervisory and management staff. In her employment history, Veronica showed that since 2003 she had her own human resource

7

(hereafter "HR") consulting firm. In fact, her firm is called Veronica HR Consulting in Burlington, WI. She had been providing HR consulting services for various industries including a printing company, a precision manufacturing company, an international thermoforming company and a social media company. She was the Corporate Director, HR for dental company. Veronica was not enlisted to see how much about being a "minuteman" she knew or had experience in, but rather, to see if Defendant was retaliating against Plaintiff and if Defendant had allowed a hostile workplace environment to exist – HR related issues. Rule 702 does not require as Defendant suggests.

The Court should deny Defendant's imperative that Veronica know about what is means to be an EPV for the reasons stated above. This would be like saying that Sage Steele, a television ancho who is lead host of SportsCenter On The Road would have had to play pro football in order for her to provide expert narration and commentary on such games – this is nonsense. Rule 702 does not require this. Veronica does possess the relevant knowledge and skill to the relevant question – retaliation and hostile work environment.

4. **Veronico's Legal Conclusions/Interpretations of the Law Should be Barred**.

Veronica's conclusions should be allowed because it satisfies the requirements of Rule 26(a)(2)(B) and Rule 702. Veronica was asked what "hostile work environment" meant to her, and, not what was legally required. If she testifies at trial, any ambiguities can be cleared up at that time on both direct and cross-examination or by an instruction from the court. If she doesn't testify, her report and testimony could be barred. Expert reports don't need to be perfect.

For the reasons stated above, Defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted,

_____
John M. O'Toole, Attorney for Plaintiff

| | |
|---|---|
| John M. O'Toole | |
| Attorney No.: | 6199003 |
| Attorney: | John O'Toole |
| Firm: | O'Toole Law Firm, LLC |
| Address: | 35 E. Wacker Dr., Suite 650, Chicago, IL 60601 |
| Office Phone: | (312) 546-5057 |
| Cell Phone: | (312)560-8981 |
| FAX: | (312)546-5123 |
| E-Mail: | john@otoolelaw.net |