| | | |
|---|---|---|
| TERRY SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 15 C 2061 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ILLINOIS DEPARTMENT OF | ) | |
| TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In August 2013, Terry Smith started a six-month probationary period as an Emergency Traffic Patrol Minuteman with the Illinois Department of Transportation (IDOT). R. 55, DSOF ¶ 4.[1] But Smith never became a permanent employee, *see* DSOF ¶ 6—IDOT fired him in January 2014, after Smith accumulated several poor performance evaluations and engendered complaints from coworkers and supervisors. *Id.* ¶ 95. Smith alleges that IDOT engaged in racial discrimination, retaliation, and harassment under Title VII of the Civil Rights Act and 42 U.S.C. § 1981. DSOF ¶¶ 2-3; DSOF Exh. 1, Compl.; *see* 42 U.S.C. § 2000 *et seq.*[2] IDOT moves for summary judgment against all of Smith's claims. R. 53, Def. Mot. for Summ. J. For the reasons discussed below, the motion is granted.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" for IDOT's Statement of Facts [R. 55]; "PSOF" for Smith's Statement of Additional Facts [R. 63-2]; "Pl. Resp. DSOF" for Smith's Response to IDOT's Statement of Facts [R. 63-2]; and "Def. Resp. PSOF" for IDOT's Response to Smith's Statement of Additional Facts [R. 65]. When undisputed, only the asserting party's statement of facts is cited.

[2]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

# I. Background

In deciding IDOT's motion for summary judgment, the Court views the evidence in the light most favorable to Smith. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In August 2013, Terry Smith, an African-American man, joined the Illinois Department of Transportation as an Emergency Traffic Patrol "Minuteman" (also called ETPs). DSOF ¶¶ 1, 4. Minutemen are responsible for removing disabled cars from the roadway, responding to assistance calls, ensuring departmental compliance with safety rules, and operating Large CDL Class A vehicles. *Id.* Smith started on a six-month probation period along with another new hire, Jamie Lopez. DSOF ¶¶ 5-6. To become a permanent IDOT employee, probationers must satisfactorily complete training and meet performance expectations. *Id.* ¶ 6. Throughout the training period, the probationary ETPs rotated among three shifts (A-, B-, and C-Shift) and worked alongside "Lead Workers," reported to "Lead Lead Workers,"[3] and were shadowed by Field Training Officers. *Id.* ¶¶ 8-11, 14.[4] The job itself is "very dangerous," and employees must be able to perform arduous labor, follow instructions carefully, and work together seamlessly, because the ETPs rely on each other for assistance and protection. DSOF ¶ 7. When the highways comprise the workplace, mistakes can be fatal. *Id.*

---

[3]As in, the *lead*er of Lead Workers.

[4]Because there is a large cast of characters in Smith's case, employees will frequently be prefaced with an abbreviation of their position title: LW for Lead Workers, LLW for Lead Lead Workers, and FTO for Field Training Officers. For Smith's retaliation and hostile work environment claims, the employee hierarchy is relevant.

At the start of probation, Smith and Lopez each received two initial weeks of classroom instruction from a Lead Worker, Angel Ramirez, who also taught them the basics, like how to navigate the highways, how to use the equipment, and how to use the radio. DSOF ¶ 13. Next, Smith started field training, which involved driving highway routes in an emergency patrol vehicle, a truck used to tow cars and upright rollover vehicles. *Id.* ¶ 14. During this time, Smith was shadowed by various Field Training Officers (FTO), who observed his progress, taught him new skills, and corrected him when he erred. *Id.* It was these FTOs who provided the formal written evaluations of each trainee's performance. *Id.*

## A. Time on A-Shift

Smith's problems began soon after he started work. LW Ramirez assisted in Smith's training on his first shift, the A-Shift. DSOF ¶ 16.[5] Soon, Ramirez received several complaints from the shadowing FTOs that Smith would "debate his instructions" and question the directives he was given, which hindered the training process for both Smith and his training partner, Lopez. DSOF ¶ 16. When LW Ramirez eventually evaluated Smith as part of the training process, Ramirez

---

[5]In this instance (and indeed, throughout his responses), Smith contends in his Response to IDOT's Statement of Facts that a statement—such as the reports that Smith would "debate his instructions" made to LW Ramirez—is undisputed as to having been said, but "disputed as to its truth." Pl. Resp. DSOF ¶ 16. But then Smith does not cite to any contrary evidence demonstrating otherwise. Northern District of Illinois Local Rule 56.1 requires that the responding party include a "response to each numbered paragraph in the moving party's statement, including, *in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.*" L.R. 56.1(b)(3)(C) (emphasis added). Smith's responses that a material fact submitted by IDOT is undisputed as to content but "disputed" as to its truth—without then supplying any citation to supporting evidence—thus fail to properly dispute the particular factual assertion by the defense and the assertion is deemed admitted.

commented that Smith could not accept critiques or use criticism to improve his performance, and Ramirez went so far as to say that Smith was not taking the job seriously. *Id.* Smith also had trouble identifying the major highway patrol routes and had trouble using the two radios that all Minutemen carry. *Id.* ¶¶ 17-18.

When working on the A-Shift, Smith was also trained by FTO Marcello Valle, LW Lloyd Colbert, FTO Cliff Thomas, and FTO Gerald Washington. DSOF ¶¶ 20-22, 26. Valle shadowed Smith on three occasions. During one of those times, Smith was driving Valle on express lanes. *Id.* ¶ 20. They approached a part of the express lanes where the lanes split—divided by a concrete pillar—into express to the left and locals to the right; Valle told Smith to take either one. *Id.* ¶ 20; *id.* Exh. 9, Valle Dep. 42:20-43:23. But Smith did not decide to go one way or the other—instead, he stopped 30 feet from the concrete pillar. DSOF ¶ 20; *id.* Exh. 9, Valle Dep. 43:13-23. After Valle "found it hazardous to my health when someone can't make a decision and decides to go forward into a concrete pillar," *id.* Exh. 9, Valle Dep. 43:21-23, he asked to be removed from Smith's training regimen due to Smith's "unsafe conduct and lack of following basic instruction." *Id.* ¶ 20; *id.* Exh. 56, 9/4/13 Valle Memo.

LW Colbert also had driving scares while training Smith. DSOF ¶ 21. According to Colbert, Smith would slam on the Emergency Patrol Vehicle's brakes, turn poorly, and one time even drove away from a gas pump with the pump's nozzle still inserted into the truck. *Id.* Colbert was concerned enough that he wrote an email to other employees, including Lead Lead Worker Zen McHugh, alerting them to Smith's lack of driving skills (colorfully comparing Smith to a 16-year-old new driver),

and warning that if Smith worked on the road, "someone else will pay the ultimate price." *Id.*; Exh. 19, 9/4/13 Colbert to Eaves Email.

In addition to Valle and Colbert, FTO Thomas expressed similar red flags, memorialized in a memo to Patrol Manager (PM) John Gonzalez. *See* DSOF Exh. 20, 9/2/13 Thomas Memo. In the memo, Thomas detailed seven instances of Smith's deficient performance. In the most disturbing, Smith ignored instructions to put the truck in neutral and pull the brake. *Id.* ¶ 23.[6] As a result, Thomas almost became pinned between the tow truck and another vehicle while investigating a rollover. *Id.* Based on his interactions with Smith, Thomas reported that Smith was "untrainable and unsafe." *Id.* ¶ 24; *id.* Exh. 20, 9/2/13 Thomas Memo.

Another FTO, Gerald Washington, wrote a memo about Smith's performance, remarking that Smith was not picking up the functions of the job and had engaged in dangerous behaviors, like slowing down to answer the radio in the middle of traffic. DSOF ¶ 27. Washington expressed hope that maybe Smith would catch up, but said he could not "risk taking him out with me anymore." *Id.*; *id.* Exh. 21, 9/4/13 Washington Memo.

To try to get Smith up to speed, the Patrol Manager, Gonzalez, put corrective action programs into place, which included giving Smith repetitive assignments to help him become more familiar with the geography; extra radio operations lessons so

---

[6]Smith does dispute this, Pl. Resp. DSOF ¶ 23, and points to another complaint he filed on "8/22/12" (presumably the actual year was 2013), but that complaint describes a truck incident between Smith and Valle, not Smith and Thomas. So DSOF ¶ 23 is deemed admitted because the evidence cited by Smith does not rebut the defense's factual assertion.

he could become more comfortable with using the radio; and additional driving instructions so he could correct his poor driving habits. DSOF ¶¶ 28-30.

Smith's supervisors began documenting his problems on the job as early as August 18, 2013, when LW Ramirez wrote in an email to PM Gonzalez, Operations Manager (OM) Mike Schivarelli, and LLW McHugh that Smith "debate[s] his instructions from his FTOs," and his defiance was "becoming a serious issue with his training." DSOF ¶ 36. The very next day, LW Ramirez and LLW McHugh counseled Smith (apparently for the third time) about this behavior and his "failure to understand basic instructions." *Id.* ¶ 37. On August 22, PM Gonzalez followed up with Smith to counsel him on "not taking orders" and the "disrespect" he showed to his trainers and FTOs. *Id.* ¶ 38. On that same day, however, Smith wrote a memo to Gonzalez—titled "Discrimination/harassment at the workplace,"—that detailed an August 19 meeting with LLW McHugh. *Id.* ¶ 39; *id.* Exh. 26, 8/22/13 Smith Internal Compl. 4. Smith contended that McHugh said, "[I]f one more person claims you[']r[e] confrontational, you will be terminated," and that all Smith should be saying is "yes sir or no sir." *Id.*

Smith's formal evaluations during this period reflected similar issues with his work performance. His August to September review rated him "Unsatisfactory" in myriad skills rankings. DSOF ¶ 43; *id.* Exh. 27, August Personnel Eval. In the remarks section, LW Ramirez wrote that Smith took too long to write up assist sheets and consistently failed to follow instructions, which was a safety issue. *Id.* According to Smith, the poor evaluation was itself an act of retaliation for Smith complaining

about FTO Valle's profanity. DSOF ¶ 45; *see also id.* Exh. 23, 8/22/13 Smith Int. Compl. 2. An October progress report that Ramirez wrote remarked that Smith was showing improvement, but that he still needed to work on his "basic driving skills," "highway geography," "multi-tasking," and "over confidence." *Id.* ¶ 46; Exh. 28, 10/13/13 Smith Progress Report.

For his part, Smith contends that, during the time that he spent on the A-Shift, he suffered harassment, particularly at the hands of FTO Valle. Their run-ins began on August 18, 2013, when Valle allegedly yelled foul language at Smith and refused to allow Smith enough time to complete an equipment check on Valle's vehicle before leaving the garage. DSOF ¶ 31. Smith asserts that he was later blamed for damage to the vehicle. *Id.* That same day, Smith contends that LW Ramirez accused him of being late, docked him 15 minutes of pay, and made him fill sandbags instead of sending him on the road. DSOF ¶ 48. On August 22, Smith wrote another memo, addressed to Patrol Manager Gonzalez, titled "Abusive language, rude to motorist discrimination/harassment," in which he complained about Valle's "abusive language, swearing, and hollering." *Id.* ¶¶ 33-35; PSOF Exh. 6, 8/22/13 Smith Internal Compl. 1. Gonzalez did investigate this complaint, but could not confirm that Valle used abusive language toward Smith. DSOF ¶ 42; Pl. Resp. to DSOF ¶ 42.

### B. Time on B-Shift

If Smith and IDOT hoped that a change to the B-Shift would help, their hopes were misplaced. For instance, on October 13, 2013, LW Colbert sent Smith back to

the garage around two hours before the end of the shift. DSOF ¶ 50.[7] The asserted reasons for cutting Smith's shift short included: Smith not listening to the radio; failing to know his location; leaving his trainer without permission; and failing to respond to a serious rollover accident with significant injuries. *Id.* In response, Smith contends that this early dismissal and the resulting two hours of docked pay (though Smith eventually was paid for the time) were acts of retaliation for his August complaint against FTO Valle. DSOF ¶ 51. Smith made the assertions of retaliation in three memos filed with IDOT's Human Resources department. *Id.* ¶ 52, Exh. 30, 10/13/13 Smith Int. Compl. 5.

Smith's B-Shift performance evaluations were no better than his A-Shift evaluations. LW Joseph Huante memorialized his review in an email to PM Gonzalez. DSOF ¶ 53. In the review, Huante said that Smith was "very behind where he should be at this stage of the training period, and I am not sure further training is going to help." *Id.*; *id.* Exh. 31, 11/25/13 Huante to Gonzalez Email. He offered to assist Smith in additional training to try to prepare him "for the road." DSOF Exh. 31, 11/25/13 Huante to Gonzalez Email; Pl. Resp. DSOF ¶ 53.

When it came time for PM Gonzalez to rate Smith's B-Shift performance, Gonzalez scored Smith's performance as unsatisfactory in five responsibility categories. DSOF ¶ 79; *id.* Exh. 41, Nov. Personnel Eval. He also referred to Smith's myriad of poor evaluations from his various supervisors, noting that Smith "fails to

---

[7]Smith disputes this, but only to say that Colbert had no authority to take the action, which is immaterial. *See* Fed. R. Evid. 401. The fact is deemed admitted. Pl. Resp. DSOF ¶ 50.

answer his radio calls, is not sure of his locations, makes poor or unsafe decisions during a motorist assist, passes up motorists on the shoulder[,] and is uncertain what to do at an accident scene. When asked by a supervisor to explain or is given constructive criticism, Mr. Smith advises he was never trained properly and becomes argumentative." *Id.* Gonzalez concluded that Smith was still failing to "grasp the most basic functions of his job duties." *Id.* According to Smith, this poor evaluation was an act of retaliation. DSOF ¶ 78.

### C. Time on C-Shift

For the last phase of their probationary period, Smith and Lopez were moved to the C-Shift in December 2013. Although FTOs typically stopped shadowing Minutemen by this point in training, IDOT continued having FTOs shadow both Smith and Lopez, because IDOT was concerned that Smith was not working safely. DSOF ¶ 54. Smith complained about the continued shadowing and unavailability of overtime pay in two memos to PM Gonzalez: a December 5 Memo titled "Refused overtime pay, Retaliation/Harassment," and a December 6 Memo titled "Refused overtime/discrimination." DSOF ¶ 59; *id.* Exh. 32, 12/5/13 Smith Int. Compl. 6; *id.* Exh. 33, 12/6/13 Smith Int. Compl. 7. The gist of these complaints was that LW Colbert refused to sign off on Smith's overtime, that he and Lopez were still being shadowed, and that they were not allowed overtime on the C-Shift, according to Smith. *Id.*

The training staff on the C-Shift also found Smith's performance to be underwhelming. LW John Seifried and FTO Roman McGhee were both concerned

with Smith's poor driving, failure to listen, and his weak skills on the radio and in knowing his location. DSOF ¶¶ 64-67. His supervisors tried to rectify the problems with additional counseling and correction. DSOF ¶ 64. Both FTO McGhee and LW Seifried realized that Smith was taking too long to respond on the radio (or not properly responding at all), and McGhee and Seifried both later instructed Smith some more on how to monitor the radio and made additional calls to Smith to test his radio skills. *Id.* ¶¶ 67-68. LW Seifried also noted multiple occasions of Smith passing up stranded motorists and failing to assist at calls, even when fellow Minutemen were obviously struggling. *Id.* ¶¶ 69-70.[8] Seifried documented his and other supervisors' fears about Smith's performance in a December 18 email to LLW Mark Jercha, OM Schivarelli, and PM Gonzalez, in which Seifried explained that Smith was not ready for the job, could not take constructive criticism, and continued to be a safety hazard to himself and other drivers. *Id.* ¶ 71; *id.* Exh. 37, 12/18/13 Seifried to Jercha Email. Several weeks later, Seifried followed up with another email to the same group, noting that he did not see any improvement in Smith and listing out the same performance problems that had plagued Smith's tenure on the C-Shift. *Id.* ¶ 75; *id.* Exh. 40, 1/2/14 Seifried to Jercha Email.

In the meantime, Smith filed another complaint, this one to OM Schivarelli, requesting a change in shift due to "discrimination, harassment, [and] retaliation."

---

[8]Smith disputes that the deposition of Seifried does not support IDOT's contentions, because Seifried does not specifically testify that Smith passed stranded motorists on "several" instances. Pl. Resp. DSOF ¶ 69. That is true—the word "several" is not in the testimony on this line of questioning—but Seifried does testify, in detail, about the specific circumstances of multiple occasions that Smith passed stranded motorists. *See* DSOF Exh. 7, Seifried Dep. at 24:12-25:9, 30:16-31:8.

DSOF ¶ 74; *id.* Exh. 39, 12/30/13 Smith Int. Compl. 9. That complaint came after a December 27 incident where FTO McGhee heard Smith announce over the radio that he was going to "back up" two cars in an accident down a highway ramp, which McGhee testified is an extremely unsafe practice. *Id.* ¶ 72; *id.* Exh. 36, McGhee Dep. at 43:7-15, 59:10-14. At the end of the shift, LW Seifried tried to advise Smith about discontinuing that dangerous practice, but Smith ignored the rebuke, called Seifried a liar, and topped it off by telling Seifried that he did not have to listen to him anymore. DSOF ¶ 72. The next day, Smith denied the event entirely, telling FTO McGhee that he never meant to back the cars off the ramp. *Id.* ¶ 73. That discussion became a heated exchange, according to Smith, in which FTO McGhee called Smith a "God damned liar" and a "stupid dumb mother F'r," among other foul language. DSOF ¶ 81. Smith walked away from the altercation, and coworkers held McGhee back. *Id.* PM Gonzalez investigated the incident, but could not get a clear picture of what happened—still, he reprimanded McGhee for the outburst. *Id.* ¶ 82; *see* Pl. Resp. DSOF.

On December 31, 2013, Smith filed an internal EEO Complaint with IDOT, alleging discrimination and retaliation based on his race. DSOF Exh. 42, 12/31/13 IDOT EEO Compl.; DSOF ¶ 84. In that complaint, Smith listed three dates of incidents, including (1) the October 13, 2013 incident in which LW Colbert dismissed Smith two hours early; (2) the December 5, 2013 incident in which LW Colbert allegedly refused to pay Smith for previously authorized overtime pay; and (3) the December 28, 2013 incident in which McGhee yelled and swore at Smith. DSOF Exh.

42, 12/31/13 IDOT EEO Compl.[9] But instead of detailing his version of those events, Smith only said that Lopez was treated better than him, and that Smith was improperly denied overtime pay. *Id.* The internal complaint named LW Colbert, LLW McHugh, LW Seifried, and LW Thorpe as the subjects of the complaint, *id.*, but why each was included is not entirely clear. IDOT investigated the complaint and found the allegations to be unsubstantiated. DSOF ¶ 87. In January 2014, LW Colbert allegedly retaliated against Smith for filing the December 2013 complaint by calling him a "stupid-ass ni**a." DSOF ¶ 88.

## D. Termination

On January 9, 2014, Smith attended a pre-disciplinary meeting, having been charged with "Unsatisfactory Work Performance" during his probationary period. DSOF ¶ 89; *id.* Exh. 46, Statement of Charges. At that meeting, Smith was informed that he had failed to successfully complete his probationary period. *Id.* On January 16, Operations Manager Shivarelli wrote a memo recommending that Smith not be certified as a permanent Minuteman in light of Smith's failure to comply with numerous IDOT policies, the poor evaluations, and the poor work performance. DSOF ¶¶ 90-92; Ex. 48 1/16/14 Schivarelli Memo. According to Smith, Schivarelli retaliated against Smith by withholding his permanent certification. DSOF ¶ 93.

After failing to achieve certified status, Smith had his last day of work at IDOT on January 23, 2014. IDOT officially discharged him from his probationary position

---

[9]The complaint only lists the incident dates, but does not explain which particular events they pertain to. To aid the reader, the Court refers back to complaints made surrounding those dates.

on January 30 through a certified letter, which Smith received on February 3. DSOF ¶ 95. But on February 2, Smith was charged in the Circuit Court of Cook County with Reckless Conduct, for an incident where he endangered the safety of LW Colbert. *Id.* ¶ 97.[10] In that instance, Smith drove his Chevy Impala from the center lane into the left lane, in an attempt to push Colbert's IDOT truck into the concrete median. *Id.* Smith called this report false and declared Colbert's police report an additional act of retaliation against him. *Id.* ¶ 99. But Smith was convicted of that offense in November 2014. *Id.* ¶ 98.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking

---

[10] *See also* Pl. Resp. DSOF ¶ 97. Smith disputes the facts of the charge, but does not properly dispute the text of the misdemeanor offense complaint, which is the fact that IDOT asserted in DSOF ¶ 97. But that is neither here nor there, because Smith is collaterally estopped from relitigating the issue. *See infra* Section II.2.D.

summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Abandoned Claims

As a preliminary matter, IDOT argues that Smith abandoned the claims of race discrimination (as distinct from retaliation and harassment). The discrimination claims were brought under Title VII and 42 U.S.C. § 1981, and included a failure-to-promote claim under Title VII. Def. Mot. Summ. J. at 2-3. Smith has repeatedly acknowledged that he does not plan to pursue a claim based on race discrimination. *See* DSOF Exh. 3, Smith Interrogatory Resp. ¶¶ 4-5; R. 63, Pl. Resp. at 3.[11] And in his response brief, Smith concedes that summary judgment should be granted on the Section 1981 and failure-to-promote claims. Pl. Resp. at 3. In light of those explicit waivers, summary judgment is entered against those claims. *See Wojtas v. Capital Guardian Trust Co.,* 477 F.3d 924, 926 (7th Cir. 2007).

### B. Retaliation

Title VII bars employers from retaliating against their employees for complaining about discrimination. 42 U.S.C. § 2000e-3(a). Smith claims that IDOT

---

[11]In any event, it is not clear that IDOT, which is an arm of the State of Illinois, can be subject to liability under 42 U.S.C. § 1981.

retaliated against him after he submitted various internal complaints against his superiors, all premised on racial discrimination or racial harassment. *See* Pl. Resp. at 3-5. For the retaliation claims to survive summary judgment, Smith must show that a reasonable jury could find that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) the adverse action was motivated by the protected activity. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). The Court examines each element in turn.

## 1. Protected Activity

Title VII protects employees against retaliation for complaining about discrimination. But the complaints must specifically protest discrimination on the basis of "sex, race, national origin, or some other protected class." *Orton-Bell v. Indiana*, 759 F.3d 768, 776 (7th Cir. 2014) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006)). It is not enough to "complain[] in general terms of discrimination." *Orton-Bell*, 759 F.3d at 776. That would be "simply a complaint about some situation at work," *Cole v. Board of Trustees of NIU*, 838 F.3d 888, 901 (7th Cir. 2016), and those types of complaints are not protected by Title VII. So, to qualify as protected activity, the employee's complaint must "indicat[e] a connection to a protected class or provid[e] facts sufficient to create that inference." *Orton-Bell*, 759 F.3d at 776. On format, protective activity can be presented in various forms, including internal company complaints (so long as the employee reasonably believes in good faith that discrimination happened). *See Mattson v. Caterpillar, Inc.,*

359 F.3d 885, 891 (7th Cir. 2004); *Deloughery v. City of Chi.,* 422 F.3d 611, 613-14 (7th Cir. 2005).

Applying those principles to the case at hand, some of Smith's complaints cannot possibly be the basis for his firing on January 30, 2014. *See Durkin v. City of Chi.*, 341 F.3d 606, 614-15 (7th Cir. 2003) (holding that events that predate the statutorily protected activities cannot be retaliatory). The charges filed with the Illinois Department of Human Rights and the EEOC occurred *after* his discharge, so he cannot premise his retaliatory-firing claims on those complaints. *See* DSOF Exh. 1, Compl. Attach. 1-2. The same goes for the memo that Smith authored in July 2014. PSOF Exhs. 8 and 9, 7/14/14 Smith Complaints. Setting aside the firing, Smith cannot argue that his August 22 internal complaints prompted LW FTO Valle to retaliate on August 18—four days before the August 22 complaints—by using abusive language. R. 54, Def. Br. at 14; DSOF ¶¶ 31-33.

But Smith did submit around 10 internal memoranda to Patrol Manager Gonzalez and others throughout the probationary period. *See, e.g.*, DSOF Exh. 22, 8/22/13 Smith Int. Compl. 1;[12] *id.* Exh. 23, 8/22/13 Smith Int. Compl. 2; PSOF Exh. 7, 8/22/13 Smith Int. Compl. 3; DSOF Exh. 26, 8/22/13 Smith Int. Compl. 4; *id.* Exh. 30, 10/13/13 Smith Int. Compl. 5; *id.* Exh. 32, 12/5/13 Smith Int. Compl. 6; *id.* Exh. 33, 12/6/13 Smith Int. Compl. 7; *id.* Exh. 34, 12/28/13 Smith Int. Compl. 8; *id.* Exh. 39,

---

[12]There is another complaint about the same incident, but it is unclear if it is another separate complaint or an additional page to the included one. *See* PSOF Exh. 5. It does not detail or allege any type of discrimination or harassment. *Id.* For the purposes of this motion, it is immaterial and considered in conjunction with DSOF Exh. 22, 8/22/13 Smith Int. Compl. 1.

12/30/13 Smith Int. Compl. 9; *id.* Exh. 42, 12/31/13 IDOT EEO Compl. Those complaints were submitted over a four-month span and frequently employed the words "discrimination," "harassment," and "retaliation." *See id.* It is true that those are not necessarily magic words that automatically qualify the internal memoranda as statutorily protected activity. And several of the internal complaints do not draw a clear connection between race and the alleged misconduct. At the summary judgment stage, however, the evidence must be viewed in Smith's favor. Viewed through that perspective, a reasonable jury could find that some of the internal memos do allege facts that raise an "inference" of racial discrimination or racial harassment. *See Orton-Bell,* 759 F.3d at 776.

For example, Smith submitted four separate memos on August 22, 2013. *See* DSOF Exhs. 22, 23, 26; PSOF Exh. 7.[13] It is true that one of the memos does not allege any facts or use any language alleging discrimination of any kind. DSOF Exh. 22, 8/22/13 Smith Int. Compl. 1. But the others, especially when read together (remember, Smith did file them all on the same day) draw the necessary links between adverse action and protected class (at least a reasonable jury could so find). In the complaint titled, "Discrimination and Harassment in the Workplace Grievance," Smith listed the names of his supervisors, followed by each of their racial backgrounds. PSOF Exh. 7, 8/22/13 Smith Int. Compl. 3 (describing a supervisor as

---

[13]Two were addressed to Patrol Manager John Gonzalez, one was addressed to "Danny Gigoli," and another did not name anyone in the "To" field. *See* DSOF Exhs. 22, 23, 26; PSOF Exh. 7. Danny "Gigoli" almost surely is Danny *Giglio*, a Lead Worker on the A-shift, DSOF ¶ 11, and was arguably an appropriate person to receive a complaint from Smith. *See* DSOF Exh. 1, Compl. Attach. 2 at 3.

"being of Hispanic descent"). At the end of the list, Smith writes that he himself is of "black descent African American," and immediately following that observation is the allegation that he "experience[d] a hostile environment, [and] unequal treatment" that hindered his training. *Id.* Indeed, he goes on to explicitly write that the treatment violates "Title VII of the Civil Rights Act of 1964," and asks for a transfer to avoid retaliation *Id.*

The other two memos submitted the same day also include "discrimination" and "harassment" in their titles. DSOF Exh. 23, 8/22/13 Smith Int. Compl. 2; *id.* Exh. 26, 8/22/13 Smith Int. Compl. 4. In those complaints, Smith details abusive language allegedly used against him by his supervisors and trainers. It is true that these two memos do not make the same overt connections to his race, but read in light of his same-day complaint listing out his supervisory staff's races, he did not need to. Both subjects of the other August 22 complaints, FTO Valle and LLW McHugh, *see id.,* were among the listed supervisors in the other, more explicit complaint, where Smith listed FTO Valle as being of "Hispanic descent" and LLW McHugh being of "Caucasi[a]n descent." PSOF Exh. 7, 8/22/13 Smith Int. Compl. 3.[14] A jury could reasonably find that the other two memos qualified as complaints against racial discrimination.

---

[14]It is unclear why the internal memo listing the races of Smith's supervisors was the only one absent from IDOT's summary judgment materials, which included 57 other exhibits. *See* PSOF Exh. 7, 8/22/13 Smith Int. Compl. 3. It is especially strange because the four memos were submitted on the same day and are in the same Bates-stamp range in the discovery production.

Moving past August 22, 2013, other follow-up complaints also included the words "discrimination," "retaliation," and "harassment," and continued to assert facts from which to infer that Smith was continuing to protest racial discrimination. For example, in one complaint addressed to PM Gonzalez, after describing another incident that Smith felt was unfair, Smith requests "that this Harassment and Retaliation [] stop." DSOF Exh. 32, 12/5/13 Smith Int. Compl. 6. The next day, Smith penned another memo to PM Gonzalez, asking that Smith and Lopez "be train[ed] like everyone else, to be treated fair" [sic]. DSOF Exh. 33, 12/6/13 Smith Int. Compl. 7. All in all, when the evidence is viewed in Smith's favor, at least some of the internal memos could reasonably be said to qualify as protected activity. This element cannot form the basis for summary judgment on the retaliation claims.

## 2. Adverse Employment Actions

Moving on, the second element of a retaliation claim requires that the plaintiff suffered a "materially adverse employment action." *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). To assess the materiality of an employment action, courts ask "whether it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* Title VII does not, however, set forth a "general civility code for the American workplace," so "petty slights, minor annoyances, and bad manners" do not qualify as materially adverse actions. *Id.* Neither does a "mere inconvenience or an alteration of job responsibilities" that would not otherwise dissuade a reasonable employee from protesting discrimination under Title VII. *Hobbs v. City of Chi.*, 573 F.3d 454, 463-64 (7th Cir. 2009).

There is no doubt, of course, that IDOT's decision to not certify Smith for permanent employment and to terminate his employment qualify as materially adverse employment actions. Also, Smith contends that he was denied overtime. That too is a materially adverse action, because an employee reasonably would be dissuaded from protesting discrimination if the punishment were denial of overtime pay.

But none of the other actions qualify. Throughout the internal memoranda, Smith complains that various job assignments and other job conditions imposed on him were, in fact, acts of retaliation. For example, Smith alleges that LLW Jercha reintroduced "shadowing" of Smith and Lopez by on-duty FTOs as retaliation for complaints that Smith filed against LW Colbert and Valle, as well as for the complaint submitted to Schivarelli on December 28, 2013. DSOF ¶ 60; *id.* Exh. 2, Smith Dep. at 135:7-136:7; *see also* DSOF Exh. 34, 12/28/13 Smith Int. Compl. 8.[15] During the probationary period, however, IDOT supervisors do shadow the ETPs. DSOF ¶ 55. Shadowing is a normal part of an ETP's training, and indeed additional shadowing can help successfully train ETPs—a fact that Smith does not dispute. *Id.*[16] The same goes for Smith's allegation that LLW Jercha retaliated against him by making him go out "on the road" while allowing his training partner, Lopez, to stay back at ETP headquarters to "work the pumps." DSOF ¶ 63; *id.* Exh. 2, Smith Dep.

[15]Of course, the December 28, 2013 complaint cannot be the basis for contending that shadowing *before* that date was in retaliation for the December 28 complaint. *See* DSOF ¶ 61; *id.* Exh. 34, 12/28/13 Smith Int. Compl. 8

[16]*See supra* footnote 5 on Smith's failure to cite contrary evidence, as required by Local Rule 56.1(b)(3)(C), in disputing this factual contention.

137:17-141:14. These are all "assignments or tasks consistent with the job duties" of an ETP. *See Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004), overruled on other grounds by *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016). Aside from the firing and the denial of overtime, Smith is essentially complaining that he was made to do his job on a given day. That does not rise to the level of a materially adverse employment action.

### 3. Causal Connection

Smith's last hurdle on the retaliation claims is to show that a reasonable jury could find that the protected activity was the but-for cause of the denial of overtime and the firing. In other words, Smith must show that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action" of the employer. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). He cannot do that: even when the record evidence is viewed in his favor, there is overwhelming evidence that IDOT trainers and supervisors reasonably believed that Smith performed unsatisfactorily in a variety of ways and contexts. The facts underlying the poor performance were detailed in the Background section, *see supra* at 3-12, but some bear repeating.

Early on, the August 2013 to September 2013 performance review rated Smith as "Unsatisfactory" in various skills rankings. DSOF ¶ 43; *id.* Exh. 27, August Personnel Eval. In the remarks section, LW Ramirez specifically observed that Smith took too long to write up assist sheets and consistently failed to follow instructions, which gave rise to safety concerns. *Id.* In response, Smith contends that the poor

performance review was an act of retaliation for Smith complaining about FTO Valle's profanity. DSOF ¶ 45. But Smith offers no evidence for that assertion. There is simply nothing that even tends to show a connection between Smith's protest of Valle's alleged profanity and the unsatisfactory August-September review. Indeed, other FTOs complained to LW Ramirez that Smith would debate instructions and question everything the trainers told him to do. DSOF ¶¶ 16, 43-44; *id.* Exh. 17, 8/18/13 Ramirez to Gonzalez Email; *id.* Exh. 27, August Performance Eval. Smith does not offer evidence to explain away those negative views of his performance. *See* Pl. Resp. DSOF ¶ 16. In the November-December evaluation, yet another supervisor, Patrol Manager Gonzalez, rated Smith as unsatisfactory in five job duties, and observed that Smith did "not grasp the most basic functions of his job duties" based on "numerous supervisor evaluations." DSOF ¶ 79; *id.* Exh. 41, Nov/Dec Performance Eval. Again, Smith does not dispute those facts with evidence, nor otherwise try to connect the performance with a motive to retaliate. And these negative performance evaluations were issued in the midst of reports that Smith was a dangerous and unskilled driver, including the time when FTO Thomas was almost pinned between two vehicles because Smith disregarded an instruction to put the truck in neutral and put on the brake. DSOF ¶ 20 (Valle); *id.* Exh. 56, 9/4/13 Valle Memo; DSOF ¶ 21 (Colbert); *id.* Exh. 19, 9/4/13 Colbert to Eaves Email; DSOF ¶¶ 23-24 (Thomas); *id.* Exh. 20, 9/2/13 Thomas Memo.

There is more. On October 13, 2013, LW Colbert sent Smith back to the garage two hours early because Smith was not listening to the radio, did not know his

location, left his trainer without permission, and failed to respond to a dangerous rollover accident. DSOF ¶ 50; Pl. Resp. DSOF ¶ 50.[17] (Smith was ultimately paid for those hours, albeit after filing a grievance. DSOF ¶ 51; Pl. Resp. DSOF ¶ 51.) Smith contends that the early dismissal was retaliation for complaints that Smith filed against FTO Valle for abusive language. DSOF ¶ 51. But no reasonable jury could find that Smith was dismissed early due to complaints filed two months earlier and filed against, no less, a *different* supervisor. The same goes for Smith's allegation that LW Colbert retaliated against him by withholding previously authorized overtime pay on December 5, supposedly because Smith submitted internal complaints on October 13. First, there is no evidence that LW Colbert was even aware of the October 13 complaints. What's more, Smith himself described Colbert's decision to deny overtime as based on a provision of the union agreement. DSOF Exh. 32, 12/5/13 Smith Int. Compl. 6.[18] Ultimately, Patrol Manager Gonzalez authorized Smith's overtime and verbally counselled Colbert on the correct policy—that if Smith was sent on an assist that exceeded his scheduled hours, he needed to be paid overtime.

---

[17]Smith argues that these facts are disputed, because Colbert had no authority to dismiss him early. But Smith does not cite to any admissible evidence that Colbert did not have that authority. More importantly, even if Colbert could not send Smith back early, Smith does *not* dispute that the underlying performance problems happened, namely, that he failed to listen to his radio and ignored an important assignment. So those facts are deemed admitted. In the Local Rule 56.1 Statement, IDOT's assertion was not that LW Colbert had the authority to dismiss Smith early, but rather that Smith failed to do his assigned work on October 13, 2013. Smith does not dispute that the day played out as Colbert testified. *See* DSOF Exh. 18, Colbert Dep. 24:17-27:22.

[18]The agreement itself is apparently not in the record, but that does not matter because Smith himself cited Colbert's reasoning in his internal complaint, which raises no inference of retaliation. *See* DSOF Exh. 32, 12/5/13 Smith Int. Compl. 6.

DSOF ¶ 58; *id.* Exh. 8, Gonzalez Dep. 74:7-75:17. None of those facts remotely suggest that LW Colbert denied overtime with a retaliatory motive.

Finally, Smith contends that Operations Manager Michael Schivarelli retaliated against him by recommending that he not be certified as a permanent employee. DSOF ¶ 93. In the recommendation, Schivarelli cited numerous policy violations committed by Smith, poor work performance, multiple negative evaluations, and the "strong possibility" that Smith's continued employment would put "himself, coworkers and the motoring public in danger." DSOF ¶ 90; Exh. 48, Schivarelli Non-certification Memo. In response to this crucial assertion of facts in IDOT's 56.1 Statement, all Smith says is: "Undisputed as to what he recommended only." Pl. Resp. DSOF ¶ 90. Smith cites zero evidence to dispute the basis for Schivarelli's recommendation. *Id.*[19]

It is worth discussing one particular piece of evidence that Smith relies on in his own Statement of Additional Material Facts. Smith offers the affidavit of Marvin Harrison, who is a former IDOT employee. *See* PSOF ¶¶ 1-8. Under Rule 56, affidavits of course can be used to oppose a summary judgment motion. Fed. R. Civ. P. 56.1(c)(4). But the affidavit must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify." *Id.* The Harrison affidavit is replete with generalized assertions

---

[19]As discussed earlier, under Local Rule 56.1, Smith cannot just assert facts in his response brief and then not present them in the response to the 56.1 Statement. So any facts solely asserted in the response brief without a corresponding presentation in Smith's 56.1 response are disregarded. *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1162 (N.D. Ill. 2013); *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995)).

that lack a proper evidentiary foundation. For example, Harrison says that he "witnessed [Smith] being discriminated against on many different occasions by the department and its agents." PSOF Exh. 1, Harrison Aff. ¶ 4. But what happened on those "many different occasions?" Who was involved, and when did it happen? These are basic foundational facts that must be presented in order to show that the affidavit is based on personal knowledge.

In other instances, Harrison offers foundational facts, but the evidence ends up contradicting Smith. For example, Harrison asserts that he witnessed Colbert use the n-word against Smith "frequently." Harrison Aff. ¶ 4. But Smith himself contends that Colbert only used the slur toward him on one occasion. DSOF ¶ 88; PSOF ¶ 17. Harrison alleges that Smith had inept trainers, PSOF Exh. 1, Harrison Aff. ¶¶ 3-4, but Jamie Lopez—whom Smith offers as a comparator—had the very same training staff as Smith. DSOF ¶ 5; Pl. Resp. DSOF ¶ 5.[20] The Harrison affidavit does not rebut IDOT's overwhelming evidence that supervisors genuinely believed that Smith had performed unsatisfactorily—even dangerously—while on the probationary period.

### 4. Retaliatory Police Report

A separate discussion is warranted on Smith's contention that LW Colbert filed a false police report against Smith, which resulted in a reckless-conduct charge filed against Smith in February 2014. DSOF ¶¶ 97-99. Smith was charged with driving his car into Colbert's truck (while Colbert was in it), in an attempt to push Colbert

---

[20]Smith disputes that he and Lopez had the same training, but he only cites PSOF ¶ 16, which actually refers to a statement by Seifried and has nothing to do with Lopez's training. So the fact is deemed admitted.

into a concrete median. DSOF ¶ 97. Smith denies that happened, and asserts that he was with his girlfriend at the time of the alleged attack. Pl. Resp. DSOF ¶ 97.

But that argument is foreclosed by issue preclusion: the state trial judge found Smith guilty of the reckless-conduct offense in September 2014. DSOF ¶ 98; *id.* Exh. 51, *Illinois v. Smith*, No. 14 1 20661, Bench Trial Tr. at 71:12-75:4, 79:9-10 (Sept. 22, 2014). Issues that have been previously "litigated fully and decided with finality in a previous proceeding" are barred from relitigation by the principle of collateral estoppel. *Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1020 (7th Cir. 2006). Illinois rules of issue preclusion govern. *Brown v. City of Chi.,* 599 F.3d 772, 774 (7th Cir. 2010). In Illinois, issue preclusion applies when there is an identity of the issue; there is a final judgment on the merits in the prior case; and the estopped party was a party (or in privity with one) in the prior case. *Dunlap v. Nestle USA, Inc.*, 431 F.3d 1015, 1018 (7th Cir.2005) (citing *Herzog v. Lexington Twp.*, 657 N.E.2d 926, 929-30 (Ill. 1995)).

Here, Smith already litigated whether he tried to push Colbert's truck into the median. Smith contended that he fell asleep in the car while out with his girlfriend. DSOF Exh. 51, *Illinois v. Smith*, No. 14 1 20661, Bench Trial Tr. at 72:16-74:4 (Sept. 22, 2014). But he lost. Indeed, during the state-court trial, evidence was introduced about Smith's workplace run-ins with Colbert and Smith's suspicion that Colbert was retaliating against him *See id.* 29:1-36:13. So issue preclusion applies: the police report filed by Colbert was not based on made-up charges. Smith is stuck with a finding that he intentionally used his car in an attempt to push Colbert into the

concrete median. That finding forecloses Smith's theory that Colbert dreamt up the charges to retaliate against him.

### C. Hostile Work Environment

Next up is Smith's hostile work environment claim. Title VII prohibits employers from imposing a hostile work environment on an employee based on race. *See Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.,* 804 F.3d 826, 831-32 (7th Cir. 2015). The elements of a racially hostile work environment claim are: (1) the employee was subjected to unwelcome harassment; (2) the harassment was based on race; (3) the conduct was so severe or pervasive as to create a hostile work environment; and (4) there is a basis for employer liability. *Id.* at 834. Even when the evidence is viewed in Smith's favor, no reasonable jury could find that the alleged harassment was severe or pervasive enough, and (save for a few exceptions) that the alleged harassment was racially motivated.

It is true that harassing conduct need not be both severe *and* pervasive—even one instance might be "sufficiently severe" to constitute harassment. *Jackson v. Cty. of Racine,* 474 F.3d 493, 499 (7th Cir. 2007). And pervasiveness alone also might qualify if non-severe conduct becomes an "incessant part of the workplace" and is "corrosive enough." *Id.* Ultimately, however, the misconduct must be so severe or pervasive that it "alter[s] the terms or conditions of the employment relationship." *Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999). In this case, what Smith offers falls short of sufficient severity. For example, Smith contends that LW Ramirez made Smith fill sandbags on August 18, 2013, DSOF ¶ 48, but requiring an employee to

perform his basic job duties does not create a hostile environment. On that same day (August 18), FTO Valle allegedly yelled and cursed at Smith. Pl. Resp. DSOF ¶ 31; *see* DSOF Exh. 2, Smith Dep. 183:12-184:1, 190:6-197:7. Yelling and swearing at an employee is obviously unprofessional, but Smith does not describe that it rose to a level that could be deemed a hostile work environment. Also, on discriminatory intent, Smith conceded that Valle practiced "equal opportunity" when it came to yelling and cursing at employees and conceded that he "can't really say" and "does not know" if Valle's shouting and swearing "was because of race or because of his personal" attitude. DSOF ¶ 32; *id.* Exh. 2, Smith Dep. 79:16-80:1, 184:7-10.

Similarly, there is no evidence from which to infer that Smith's run-in with FTO McGhee was based on race. McGhee allegedly called Smith a "God damned liar" and a "stupid dumb mother F'r." DSOF ¶ 81. But this was the product of serious safety concerns: the insults were in response to Smith telling McGhee that Smith was going to "back up" two cars in an accident down a highway ramp. *Id.* ¶ 72; *id.* Exh. 36, McGhee Dep. at 43:7-15, 59:10-14. Smith provides no evidence from which a jury could reasonably conclude that McGhee's outburst was racially motivated. It is not enough to simply point to co-trainee Lopez and say that no one ever yelled at Lopez. Sure, if Lopez had proposed backing up two cars down a ramp and McGhee did not yell at Lopez, then there would be a reason to infer race might be the motivation. But there is no reason to think that happened.

The absence of severity or a race-based motive is a problem for most of Smith's other instances of alleged harassment. Smith points to LLW McHugh's warnings to

Smith about his confrontational attitude during their August 19, 2013 meeting. DSOF ¶ 39; DSOF Exh. 26, 8/22/13 Smith Int. Compl. 4. But there is no evidence of a connection to race, and verbal warnings about poor performance are not the type of severe conduct that qualifies as harassment. The same goes for Smith's allegations that Colbert dismissed Smith early by two hours during one shift and refused to authorize overtime. *See* DSOF ¶¶ 50, 57-58. Not even Smith's internal complaints about these incidents said that they were motivated by race. DSOF Exhs. 30, 32, Smith Int. Compls. 5-6.

The event that comes the closest to creating a hostile work environment is an exchange between Smith and Colbert, in which Colbert allegedly called Smith a "stupid ass ni**a." PSOF ¶ 17; Def. Resp. PSOF ¶ 17.[21] Colbert denies that the exchange ever happened. Def. Resp. PSOF ¶ 17; DSOF Exh. 18, Colbert Dep. 52:7-11; DSOF Exh. 51, *Illinois v. Smith*, No. 14 1 20661, Bench Trial Tr. at 35:6-15 (Sept. 22, 2014). Unlike the instances of yelling and delivering criticisms, of course a jury could find that Colbert's use of this vile racial slur was motivated by race. But that is the one instance of anything similar happening. To be sure, that is one of the most vile words ever invented, but generally speaking, one instance is "not sufficiently severe or pervasive to alter the conditions of employment" or to create an "objectively hostile work environment." *Sanders v. Village of Dixmoor, Ill.*, 178 F.3d 869, 869 (7th Cir. 1999) (rejecting hostile work environment claim where sole evidence of racial

---

[21]Smith also contends Colbert's use of this word was retaliation for earlier complaints. DSOF ¶ 88. But this outburst and racial slur—while troubling—do not constitute an adverse employment action in the case of Title VII retaliation. *See Hobbs*, 573 F.3d at 463-64.

harassment was the supervisor's insult, "N****r, you're suspended"); *see also Peters v. Renaissance Hotel Op. Co.,* 307 F.3d 535, 551-52 (7th Cir. 2002).[22] Just so here: without additional evidence of racial harassment, summary judgment must be granted against Smith's claim.[23]

### D. Expert Testimony

The final topic that requires discussion is Smith's reliance on a report authored by a former human-resources professional, Maria Veronico, as expert evidence under Federal Rule of Evidence 702. PSOF Exh. 10, Veronico Report. There are two barriers to considering Veronico's report as part of the evidentiary mix in support of Smith. First, as IDOT correctly argues, Smith attempted to present the report in his Statement of Additional Material Facts, but did so just by wholesale citing it as Paragraph 28 of that Statement: "Maria Veronico Report (Def. Ex. 52)." PSOF ¶ 28. In other words, instead of excerpting relevant parts and presenting the report's assertions in a paragraph-by-paragraph fashion as required by Local Rule 56.1, Smith just tried to incorporate the entirety of the report, making it practically impossible for IDOT to respond.

To be sure, that formatting problem perhaps could be forgiven based on its purported nature, that is, as expert evidence, which does not always lend itself to

---

[22]As discussed earlier, former IDOT employee Harrison did assert that Colbert called Smith "the N-word frequently," PSOF ¶ 1; *id.* Exh. 1, Harrison Affidavit ¶ 4, but there is insufficient foundation for that averment (what were the circumstances, when did those instances occur, and so on).

[23]Smith did not specifically argue that the individual instances should be considered together cumulatively. But remember that there is only one incident for which the jury could find a racial motivation.

Local Rule 56.1's paragraph-by-paragraph structure (although plenty of litigants do abide by that structure in presenting expert evidence). But there is a second problem, and it is definitely fatal: the report tries to present opinions that do not satisfy Federal Rule of Evidence 702.

Rule 702 appoints district courts as gatekeepers of purported expert testimony based on scientific, technical, and other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Rule 702 permits a witness to offer opinion testimony if the witness is qualified based on "knowledge, skill, experience, training, or education" in the pertinent field. *Mihailovich v. Laatsch,* 359 F.3d 892, 918 (7th Cir. 2004). Even if the witness qualifies as an expert, the district court still must ensure that the evidence "is sufficiently reliable to qualify for admission." *Id.* Under Rule 702, the three requirements for reliability are: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.* (quoting Fed. R. Evid. 702). To make this evaluation, the district court must "scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 804 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152). Whether to allow expert testimony rests within the discretion of the district court. *Id.* at 810.

In this case, Veronico's experience and qualifications are not the problem. She earned a bachelor's degree in business from the University of Wisconsin at Kenosha, as well as a master's degree in industrial and labor relations, with a specialty in employment law, from the University of Wisconsin at Milwaukee. DSOF Exh. 54, Veronico Dep. 26:22-27:14. She then worked in human resources departments, and eventually began consulting in human resources matters. *Id.* 30:6-7, 33:1-3, 40:16-41:7. Neither side contests that she is a qualified human resources expert.

Although Veronico's qualifications are not a problem, what she relied on in generating her opinions *is* a problem. In order for Veronico to offer reliable opinions, she must base those opinions on "sufficient facts and data." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). That she did not do. Veronico omitted a substantial set of facts from her analysis, and instead relied only on what appears to be plaintiff-curated records (the records are attached to her report). DSOF ¶ 102. The records mainly were comprised of interview summaries of IDOT employees. Pl. Resp. DSOF ¶ 106. For some unknown reason, Veronico did not consider deposition testimony in this case. DSOF ¶ 106. That left out much of IDOT's side of the case. One glaring example is Veronico's opinion that "nothing constructive was done" for Smith's job difficulties and that "there was no intention of attempting to improve plaintiff's performance." DSOF ¶ 111. But nearly all of Smith's supervisors testified in their sworn depositions about the additional training and help provided to Smith in an attempt to improve his performance. DSOF ¶¶ 25, 38, 67-68, 72, 80, 107. But Veronico was not aware of this evidence, because she never reviewed it.

Aside from the deposition problem, Veronico also had no reliable basis on which to opine that Ramirez, McHugh, and Colbert all retaliated against Smith. DSOF ¶ 110 (citing Veronico deposition testimony); *id.* Exh. 53, Veronico Report at 4-7. Veronico did not connect the alleged acts of retaliation to specific supervisors who knew about Smith's protected activity. DSOF Exh. 54, Veronico Dep. 60:12-16 ("Q. You possess no facts or data when or even if Mr. Ramirez became aware of this charge … A. I have no facts or data, correct"); *id.* 75:23-25 (same as to Colbert); *id.* 76:24-77:2. In her deposition, Veronico outright conceded, "I don't know a date of when anyone became aware of complaints." *Id.* 60:10-11. Yet a fundamental requirement of a retaliation claim is that the alleged retaliator *know* that the employee engaged in protected activity—absent that knowledge, the supervisor cannot have the requisite motive to retaliate. Veronico did not base the retaliation opinion on reliable facts.

One final flaw is worth discussing. Veronico's report offers opinions on the ultimate issues in the case, that is, whether Smith was subjected to retaliation and to a hostile work environment. It is true that Federal Rule of Evidence 704(a) says that, in civil cases, an expert opinion "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But an expert opinion on an ultimate issue still must satisfy Rule 702 (as well as Rule 403), and here—even setting aside the reliability defects identified above—it would not assist the jury to have a human resources professional offer an opinion on the ultimate issue. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) (affirming

exclusion of expert who proposed to testify whether the defendant violated the law); *United States v. Sinclair,* 74 F.3d 753, 757 n.1 (7th Cir. 1996) (expressing skepticism of expert "opinions about legal issues that will determine the outcome of the case"). Under Title VII, retaliation and hostile work environment are claims to which federal courts have given *legal* meaning (by interpreting the statutory text), and those claims have specific elements. Allowing ultimate-issue opinions in this context would trample on what the jury is supposed to decide.[24]

## IV. Conclusion

For the reasons discussed, IDOT's motion for summary judgment is granted. No reasonable jury could find for Smith on the retaliation or hostile work environment claims. The status hearing of September 13, 2018 is vacated, and final judgment will be entered.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 8, 2013

---

[24]It should be noted that the Court disagrees with the defense critique that Veronico's opinion also is unreliable because she did not engage in the same type of investigation that she would have in a real-world human resources role. Def. Br. at 20. But an expert like Veronico does not have the same capability to replicate what a human resources professional would have done at the time of Smith's probationary period. For example, it simply is not feasible to conduct in-person interviews of the supervisors and coworkers. So, although it is fair to criticize Veronico for failing to read the deposition testimony of the witnesses, it misses the mark to fault her for not conducting a real-world human resources investigation.